IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : Case No. 23-2775 |
| PHOENIX ASSET GROUP, LLC and ROBYN A. BOWMAN, | : JURY TRIAL DEMANDED |
| Defendants. | : |

# COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission ("SEC"), alleges:

1. This case stems from a fraudulent securities offering perpetrated by Defendant Robyn A. Bowman ("Bowman") and her company, Defendant Phoenix Asset Group, LLC ("Phoenix"). Between 2018 and 2020, Bowman and Phoenix raised at least $2.7 million by selling Phoenix securities to at least 20 investors.

2. Bowman and Phoenix told investors that Phoenix would use their money to purchase portfolios of distressed debt that Phoenix would place with third-party agencies for collection. They promised that Phoenix would use the money generated by the debt collection to pay investors annual returns up to 15%, plus a share in Phoenix's debt collection profits.

3. To entice investors, Bowman and Phoenix told a variety of lies to make the Phoenix investment seem much safer than it really was.

4. For instance, the investment materials they gave investors represented that investor money would be "used only for business purposes" and that no investor money would be used for "personal, household, or family purposes."

5. In reality, Bowman did not even have her own bank account. Instead, she commingled her personal finances with Phoenix's, using Phoenix's bank accounts to pay for her own personal expenditures. As part of this commingling, during the time she was selling Phoenix securities, Bowman spent more than $860,000 from Phoenix's accounts for purposes unrelated to Phoenix's business.

6. Bowman's nonbusiness uses of Phoenix money included purchasing a home in Arizona, personal credit card purchases, car and housing payments for herself and her sister, payments to her children and nephew, clothing purchases, and other personal expenditures.

7. Bowman and Phoenix likewise diverted money from certain new investors to repay earlier investors.

8. Bowman and Phoenix also lied by telling investors that the debt portfolios purchased with investor money would be insured and audited, and that she and Phoenix had never been sued in a consumer protection lawsuit. Each statement was untrue. Bowman also touted her credentials and business acumen to investors, while omitting that she had twice previously filed for bankruptcy.

9. By April 2020, Phoenix had stopped making payments to investors. Rather than acknowledge her extensive use of Phoenix money on personal

expenditures, Bowman tried blaming the stopped payments on the COVID pandemic and one of the collection agencies she hired. Bowman also continued soliciting new investments despite stopping payments to earlier investors.

10. Bowman later attempted to placate investors by falsely telling them Phoenix was ready to receive an $8 million cash influx from an Italian hedge fund.

11. Bowman and Phoenix have failed to repay their investors, who have cumulatively lost more than $1.97 million.

12. The SEC brings this lawsuit to hold Bowman and Phoenix responsible for their fraud, prevent them from harming future investors, and return money to their victims.

## JURISDICTION AND VENUE

13. The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

14. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

15. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States

District Court for the District of Minnesota and elsewhere.

16. Bowman and Phoenix directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

17. **Defendant Phoenix Asset Group, LLC** is a Minnesota limited liability company with its principal place of business located in Chanhassen, Minnesota. Phoenix issued the securities sold to investors at issue in this lawsuit.

18. **Defendant Robin A. Bowman**, age 57, is a resident of Chanhassen, Minnesota. At all relevant times, Bowman solely owned Phoenix and controlled its business activities. Bowman personally filed for bankruptcy in 1999, 2014, and 2023.

19. In the course of the SEC's investigation, Bowman and Phoenix executed tolling agreements that suspend any applicable statutes of limitations for the period through October 5, 2023.

## FACTS

### Overview of Phoenix and Its Securities Offering

20. Bowman formed Phoenix in 2009 as a company that bought, sold, and managed portfolios of distressed debt.

21. At all relevant times, Bowman controlled Phoenix, including its

4

operations, the content of representations made to investors, and how Phoenix used funds received from investors.

22. In early 2018, Bowman devised a plan to raise money by selling investors promissory notes issued by Phoenix.

23. Bowman and Phoenix represented to investors that Phoenix would pool investors' money to purchase portfolios of distressed debt that Phoenix would then assign to third-party agencies to collect on the debt.

24. Bowman and Phoenix told investors that Phoenix would use the money generated from the third-party collection agencies to make periodic interest payments to investors, allow investors to share in Phoenix's profits generated from its debt collection outsourcing, and ultimately repay investors their principal.

25. Between March 2018 and July 2020, Phoenix raised at least $2.7 million by selling promissory notes (the "Notes") to at least 20 investors from Minnesota and other states.

26. The Notes are "securities" as that term is defined in the Securities Act and Exchange Act.

27. The Notes offered various interest rates and profit-sharing percentages based on the investor's tolerance for risk. The promised interest rates ranged from 2.5% to 15% annually, while the profit-sharing amounts ranged from 0% to 50%.

28. The Notes' most common interest rate and profit-sharing terms called for investors to receive 8% annual interest payments paid quarterly, profit-sharing

payments of 20-25%, and repayment of principal in approximately two years.

29. When soliciting investments, Phoenix provided investors with the Notes as well as a Phoenix marketing PowerPoint presentation describing the investment. Bowman reviewed and approved the PowerPoint presentation.

30. Bowman and Phoenix's salespeople also relayed many of the PowerPoint presentation's statements, including those described below, when orally soliciting investors.

### Bowman's and Phoenix's Representations to Investors About the Safety of the Phoenix Investment

31. Each of the Notes Bowman and Phoenix offered and sold to investors referenced Phoenix's purchases of distressed debt portfolios, its use of collection agencies, and that the investor's "profit participation" was based on the collection proceeds of the debt portfolios purchased with investor money.

32. Each of the Notes also described the Note's purpose as a "Business Purpose Loan." The Notes thus represented: "the Loan evidenced by this Note is for business purposes…no portion of the Loan is to be used for personal, household or family purposes and [the loan] is being used only for business purposes."

33. The PowerPoint presentation given and provided to Phoenix investors similarly described Phoenix as a "Debt Portfolio Acquisition and Management Company," a "direct purchaser of distressed receivables originated by banks, credit unions and other credit grantors," and an "industry leader."

6

34. Promoting the Notes investment, the PowerPoint emphasized Phoenix's "Passive Income Streams," "Transparency," and "Experience."

35. The PowerPoint also touted Phoenix's success and the expected profits investors would receive. The PowerPoint thus represented that each month Phoenix received at least $7 million in "face value" from its debt portfolio purchases. Certain versions of the PowerPoint also represented that existing investors received a return on investment between 5% and 10% per month and between 10% and 30% per year.

36. Beyond promoting Phoenix's profitability, the PowerPoint made various representations promoting the purported safety of investing with Phoenix and the "thorough" due diligence and vetting Phoenix would perform on the collection agencies it utilized.

37. First, the PowerPoint represented that the debt portfolios purchased with investor money "are all insured for fraud and corruption by the [collection] agency via E/O [errors and omissions] policy with remit bond."

38. Second, the PowerPoint represented that investor accounts "will be audited" by a "third-party auditor/compliance company, every 6 months to ensure Proper management of inventory is maintained."

39. Third, the PowerPoint represented: "We comply with all federal, state and local regulations and have **never** been named as a defendant in a consumer protection lawsuit, an achievement that few other debt buyers can tout."

40. Fourth, the PowerPoint emphasizes Bowman's credentials as a debt collection "industry leader" and describes her business achievements.

## Bowman's and Phoenix's Representations Were Fraudulent

41. Bowman's and Phoenix's statements were false, misleading, and omitted key information.

42. For instance, unbeknownst to investors, Bowman extensively commingled investor money with Phoenix's business finances and her own personal finances.

43. To that end, Bowman did not even maintain her own personal bank account. Instead, she simply treated Phoenix's bank accounts as her own personal accounts, regularly using the Phoenix accounts to make all manner of personal expenditures unrelated to Phoenix's business.

44. For example, during the time she was selling the Notes, Bowman used more than $860,000 from Phoenix's bank accounts for purposes unrelated to Phoenix's business.

45. Bowman's spending from Phoenix's bank accounts included purchasing a home in Arizona, personal credit card purchases, car and housing payments for herself and her sister, payments to her children and nephew, clothing purchases, payments to Bowman's other businesses, medical expenses, and other personal expenditures.

46. Also, rather than using investor money solely to buy debt portfolios, on various occasions Bowman used new investor money to make payments to earlier investors.

47. Bowman's and Phoenix's statements about insurance policies covering the debt portfolios purchased with investor money were similarly false and misleading.

48. For instance, Phoenix heavily utilized Collection Agency A, which collected at least one-third of the debt purchased with Note investor money, and Bowman considered Collection Agency A to be Phoenix's "best" collection agency. However, Phoenix never confirmed that Collection Agency A had actually obtained insurance protecting the Note investors' portfolios.

49. In fact, Collection Agency A had not obtained any such insurance. Nor had various other collection agencies Phoenix utilized to collect debt for the Note investors.

50. Similarly, Bowman's and Phoenix's claims that investor portfolios were insured by a "remit bond" were also false and misleading. Indeed, Phoenix never confirmed the existence of any such remit bonds for any collection agency it utilized, and no such bonds ever existed.

51. Also false and misleading were Bowman's and Phoenix's claims that a third-party auditor would audit investors' accounts every six months to "ensure [p]roper management of inventory."

52. In fact, the "third-party auditor/compliance" company Bowman and Phoenix touted to investors was not a financial auditor. Accordingly, no firm conducted financial audits of the Note investors' portfolios or the collection agencies Phoenix retained, or otherwise ensured the debt "inventory" assigned to the agencies was being properly managed.

53. Moreover, for Collection Agency A, Phoenix did not conduct any review of its collections data until late 2020, more than two years after the Note offering began and well after the offering had already ended.

54. Likewise untrue were Bowman's and Phoenix's claims that she and Phoenix had never been named as a defendant in a consumer protection lawsuit. In reality, Bowman and Phoenix had at least twice before been sued for violating a consumer protection statute.

55. Bowman's and Phoenix's representations touting Bowman's credentials and business achievements were also misleading, because they omitted that Bowman had declared bankruptcy in 1999 and 2014.

56. Bowman and Phoenix made the above-described materially fraudulent statements and omissions knowingly or recklessly.

### Phoenix Stops Paying Investors But Bowman's Lies Continue

57. In April 2020, Bowman told investors that Phoenix would stop making the required interest payments, and Phoenix stopped making regular interest payments to the Note investors.

58. Rather than admitting that she had diverted at least $860,000 from Phoenix's bank accounts to herself and family members, Bowman blamed the COVID pandemic by telling investors that Phoenix was no longer receiving income and that most states had implemented debt collection restrictions.

59. These statements were again false and misleading. Phoenix was in fact receiving debt collection income in April 2020.

60. Moreover, the State of New York, where the collection agencies Phoenix used for the Note investors were located, had only imposed COVID restrictions on garnishing stimulus checks. New York's restrictions did not apply to the debt portfolios purchased with Note investors' money.

61. Even after cutting off regular payments to the Note investors, Bowman continued soliciting fresh investments, securing a new $100,000 Note investment in July 2020.

62. In November 2020, Bowman emailed the Note investors and attempted to blame the stopped interest payments on alleged embezzlement by Collection Agency A. Bowman's email claimed that Phoenix had been unable to catch the alleged embezzlement, even though Phoenix had been monitoring phone calls and auditing Collection Agency A's accounts. This claim was also false and misleading since Phoenix had not performed any financial audits of Collection Agency A.

63. Bowman's lies continued into January and February 2021, when

Bowman emailed investors that Phoenix was about to receive an $8 million cash infusion from an unnamed "large" Italian hedge fund. In reality, no hedge fund had advised Bowman that it would be providing that money to Phoenix.

64. In August 2020, Phoenix resumed making sporadic payments to certain investors. Between the time these limited payments resumed and early 2022, most investors received no more than three payments, and those payments did not come close to repaying what Phoenix owed. Accordingly, Bowman's and Phoenix's victims are still owed at least $1.97 million.

65. In January 2023, Bowman again filed for bankruptcy. In August 2023, with Bowman's consent, the court dismissed her bankruptcy petition.

## COUNT I

### Violations of Section 17(a)(2) of the Securities Act
### (Against Both Defendants)

66. Paragraphs 1 through 65 are realleged and incorporated by reference as though fully set forth herein.

67. By engaging in the conduct described above, Defendants Bowman and Phoenix, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have obtained money and property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

68. Defendants Bowman and Phoenix acted knowingly or recklessly in engaging in the fraudulent conduct described above.

69. Defendants Bowman and Phoenix also acted negligently in engaging in the conduct described above.

70. By engaging in the conduct described above, Defendants Bowman and Phoenix violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] in the manner set forth above.

## COUNT II

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
(Against Both Defendants)**

71. Paragraphs 1 through 65 are realleged and incorporated by reference.

72. By engaging in the conduct described above, Defendants Bowman and Phoenix, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73. Defendants Bowman and Phoenix knew, or were reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 65 above.

74. By reason of the foregoing, Defendants Bowman and Phoenix violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b)

thereunder [17 C.F.R. § 240.10b-5(b)] in the manner set forth above.

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue permanent injunctions restraining and enjoining Defendants Bowman and Phoenix from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 thereunder [17 CFR §§ 240.10b-5].

### II.

Issue a permanent injunction restraining and enjoining Defendant Bowman from directly or indirectly, including but not limited to, through the use of any entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security.

### III.

Order Defendants Bowman and Phoenix to disgorge, jointly and severally, the ill-gotten gains received because of the violations alleged herein, including prejudgment interest, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)].

### IV.

Order Defendants Bowman and Phoenix to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Permanently bar Defendant Bowman from serving as an officer or director of any company that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VI.

Grant such other relief as this Court deems appropriate.

### JURY DEMAND

The SEC hereby requests a trial by jury.

|  |  |
|---|---|
|  | **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** |
| September 11, 2023 | /s/ Benjamin J. Hanauer<br>By: Benjamin J. Hanauer |
|  | Benjamin J. Hanauer (IL No. 6280156)<br>hanauerb@sec.gov<br>Sarah E. Hancur (DC Bar No. 480537)<br>hancurs@sec.gov<br>Andrew O'Brien (IL No. 6280729)<br>obriena@sec.gov<br>175 W. Jackson Blvd., Suite 1450<br>Chicago, Illinois 60604<br>Tel: (312) 353-7390 |
|  | *Attorneys for Plaintiff* |

Craig Baune
MN Bar No. 331727
Assistant United States Attorney
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55414
Telephone: (612) 664-5600
craig.baune@usdoj.gov

*Local Counsel*