UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States Securities and Exchange Commission, | File No. 23-cv-2775 (ECT/JFD) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Phoenix Asset Group, LLC, and Robyn A. Bowman, | |
| Defendants. | |

Benjamin J. Hanauer, United States Securities and Exchange Commission, Chicago, IL, Sarah E. Hancur, United States Securities and Exchange Commission, Washington, DC, and Craig R. Baune, United States Attorney's Office, Minneapolis, MN, for Plaintiff United States Securities and Exchange Commission.

Justice Ericson Lindell and Mihajlo Babovic, Greenstein Sellers, PLLC, Minneapolis, MN, for Defendants Phoenix Asset Group, LLC, and Robyn A. Bowman.

The Securities and Exchange Commission brought securities fraud claims against Robyn Bowman and her company Phoenix. Without admitting total liability, Defendants agreed to a consent judgment, under which they accepted the Complaint's allegations for purposes of a future financial-remedies motion. The Commission now brings that motion and seeks disgorgement, prejudgment interest, and civil penalties.

The Commission's motion will be granted. As to disgorgement, the Commission has met its preliminary burden to show it is entitled to about $3 million. The burden then shifts to the Defendants, who have not demonstrated that this figure should be reduced to account for legitimate business expenses. They will be jointly and severally liable for

disgorgement.    Prejudgment interest is determined by a statutory rate applied to the disgorgement amount, and the parties dispute only the underlying figure.    Applying that agreed-upon rate to the disgorged funds produces prejudgment interest of about $900,000, again with joint and several liability.    Lastly, civil penalties will be imposed in the amount of $200,000 on Ms. Bowman and $1,000,000 on Phoenix.    Those penalties are at the high end of the statutory calculation, which is appropriate considering the egregiousness of the conduct, Defendants' degree of knowledge, investors' losses, the recurrent nature of the scheme, and Defendants' financial condition.

$$I^1$$

Robyn A. Bowman was the owner of Minnesota limited liability company Phoenix Asset Group, LLC.  Compl. [ECF No. 1] ¶¶ 17–18; ECF No. 56 ¶ 2.  Founded by Bowman in 2009, Phoenix bought, sold, and managed portfolios of distressed debt.  ECF No. 56 ¶¶ 2–4.  "In early 2018, Bowman devised a plan to raise money by selling investors promissory notes issued by Phoenix."  Compl. ¶ 22.  Defendants represented to investors that Phoenix purchased portfolios of distressed debt, assigned third-party collection agencies to collect on the debt, then used money generated from the agencies to make periodic interest payments to investors.  *Id.* ¶¶ 23–24.  From 2018 to 2020, Defendants sold

---

[1]    The Consent Judgment provides that, for the purposes of a disgorgement and civil penalties motion, "the allegations of the Complaint shall be accepted as and deemed true by the Court."  ECF No. 44 at 4–5.  Additionally, "the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure."  *Id.* at 5.

at least forty-five promissory notes, totaling more than \$4,489,376.32, to thirty-four investors.  ECF No. 50 ¶ 3; ECF No. 23-52 ¶ 9.  The promissory notes are "securities" as defined by the federal securities laws.  Compl. ¶ 26.

Defendants represented to investors on the promissory notes and in two PowerPoint presentations that the promissory notes were safe investments.  Compl. ¶¶ 31–40; ECF No. 23-23 (PowerPoint 1); ECF No. 23-19 (PowerPoint 2); ECF No. 23-1 at 99:17–100:23 (discussing PowerPoint 1); ECF No. 23-2 at 83:11–20 (discussing PowerPoint 2).  First, they represented that the funds would be used for business purposes only.  On each note was written, "Borrower [Phoenix] acknowledges and affirmatively represents to Lender that no portion of the Loan is to be used for personal, household or family purposes and is being used only for business purposes. . . .  Lender is relying upon the representations set forth in this paragraph as an inducement to make the Loan."  ECF No. 23-20 at 5; ECF No. 23-21 at 4; ECF No. 23-22 at 4.  Second, Defendants stated that investing with Phoenix was safe because of the organization's "due diligence" and Ms. Bowman's extensive industry experience.  ECF No. 23-23 at 4, 11; ECF No. 23-19 at 5–6, 11.  Specifically, they claimed that each third-party collection agency that contracted with Phoenix "has been thoroughly vetted for their business practices, reputation, appropriate licenses and E&O insurance, compliance, history of recovery rates, and references."[2]  ECF No. 23-23 at 4; *see* ECF No. 23-19 at 5 ("Each company has been through a thorough due diligence process to include copies of licensing documents and bonds, appropriate E&O Insurance, FDCPA

---

[2]     E/O means "errors and omissions"—if an agency has an E/O insurance policy, an investor is protected from loss due to the agency's fraud.  *See* ECF No. 23-2 at 92:15–93:9.

compliance, history of recovery rates, and references."); *id.* at 14 ("*ALL* portfolios are insured for fraud and corruption by the agency via E/O policy with Remit Bond."). Third, the PowerPoints represented that Phoenix "compl[ied] with all federal, state and local regulations and ha[d] never been named as a defendant in a consumer protection lawsuit, an achievement that few other debt buyers can tout." ECF No. 23-23 at 10; ECF No. 23-19 at 10. Fourth, Phoenix affirmed that investors' accounts would be audited every six months. ECF No. 23-23 at 6. Fifth, the PowerPoints touted the credentials of Phoenix's Core Management team, including education and work experience. *See* ECF No. 23-23 at 11–12; ECF No. 23-19 at 11–12.

These representations were false or misleading. Compl. ¶¶ 41–56. First, the notes were not used for "business purposes" only, as Ms. Bowman commingled her personal funds with Phoenix bank accounts. *Id.* ¶¶ 5, 42–43. From 2018 to 2020, she did not have her own personal checking account. ECF No. 23-1 at 163:1–24. She used the Phoenix account to pay her mortgage, *see* ECF No. 23-3 at 256:24–257:18, electric bills, *see id.* at 257:19–21, medical expenses, *see* ECF No. 23-2 at 199:16–23, non-business meals, *see id.* at 200:13–16, and taxes, *see* ECF No. 23-3 at 273:9–274:3. She also used Phoenix account funds on gifts to her son, *see* ECF No. 23-17 at 18:19–22:7, gambling at casinos, *see* ECF No. 23-2 at 202:17–203:11, and Minnesota Vikings season tickets, *see id.* at 203:12–204:2. Second, Phoenix's collection agencies did not obtain insurance, and no such remit bonds existed. Compl. ¶¶ 47–50. Third, no firms conducted financial audits of the promissory note investors' portfolios or the collection agencies Phoenix retained to ensure proper management. *Id.* ¶¶ 51–52. Another kind of "audit" occurred more regularly: Phoenix

would annually obtain ten phone calls from collection agencies to debtors, "five good ones and five bad ones," and listen for statements that constituted potential Fair Debt Collection Practices Act violations. ECF No. 23-2 at 93:14–22; *see id.* at 126:14–18 ("That's not what audit means. It means simply listening to tapes."); *id.* at 128:6–14 (confirming that Phoenix did not audit its investor accounts beyond listening to phone calls, and it did not review collection agencies' financial information). Fourth, Defendants were sued at least three times for violating a consumer protection statute. *See* ECF No. 23-9 at 5 (citing two suits in the United States District Court for the Western District of Michigan, Nos. 1:17-cv-00466-PLM-RSK and 1:18-cv-00410-PLM-PJG, and one suit in the United States District Court for the Northern District of Georgia, No. 4:23-CV-00001-WMR-WEJ). These were consumer protection suits. *See* ECF No. 23-29 ¶ 1 ("Defendants, Phoenix Asset Group, LLC, and Robyn Anne Bowman admit that Plaintiff's complaint purports to be based on alleged violations of the Fair Debt Collection Practices Act . . . ."); ECF No. 23-30 ¶ 1 (same). Fifth, Bowman did not disclose to investors that she personally filed for bankruptcy in 1999 and 2014, undercutting the claims of her business achievements and Phoenix's status as an industry leader. Compl. ¶ 55.

In September 2023, the United States Securities and Exchange Commission filed a Complaint against Phoenix and Ms. Bowman for violating Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]. Compl. ¶¶ 66–74. The Complaint sought injunctive relief, including an order that Ms. Bowman and Phoenix "disgorge, jointly and

severally, the ill-gotten gains received because of the violations alleged herein, including prejudgment interest." *Id.* at 14. In November 2024, the Commission moved for summary judgment on its claims. ECF No. 19. A hearing was held on that motion in February 2025. ECF No. 37.

A month after the hearing, and while the motion was still under advisement, the parties reached a consent judgment. ECF No. 40. That judgment was approved on March 14, 2025. ECF No. 44. Defendants were permanently restrained from engaging in securities fraud and "ordered, adjudged, and decreed that Defendants shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. ECF No. 44 at 4. Defendants consented that "[t]he Court shall determine the amounts of the disgorgement and civil penalty upon motion of the Commission," and that "[p]rejudgment interest shall be calculated from March 1, 2020, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." ECF No. 44 at 4.

## II

Section 21(d)(3) of the Exchange Act provides:

> Whenever it shall appear to the Commission that any person has violated any provision of this chapter, the rules or regulations thereunder . . . the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to—
>
> > (i) impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation; and

6

(ii) require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation.

15 U.S.C. § 78u(d)(3)(A).

"Disgorgement of unjust enrichment through securities violations is a recognized form of relief." *SEC v. Miller*, No. 21-cv-1445 (DSD/ECW), 2025 WL 467544, at *1 (D. Minn. Feb. 12, 2025). "Courts may order disgorgement of ill-gotten profits once a violation of securities law has been found." *SEC v. Cap. Sols. Monthly Income Fund, LP*, 28 F. Supp. 3d 887, 897 (D. Minn. 2014); *aff'd*, 818 F.3d 346 (8th Cir. 2016); *see SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990). Courts impose disgorgement using the following framework:

> Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. [T]he amount of disgorgement should include all gains flowing from the illegal activities. Disgorgement need be only a reasonable approximation of profits causally connected to the violation.
>
> The SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment. Once the SEC establishes a reasonable approximation of defendants' actual profits, . . . the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation.

*SEC v. Markusen*, 143 F. Supp. 3d 877, 893 (D. Minn. 2015) (quoting *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010)). Where "the measure of disgorgement is reasonable, the wrongdoer should bear the risk of any uncertainty." *Cap. Sols.*, 28 F. Supp. 3d at 897 (citing *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995)); *see SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) ("But the line between

7

restitution and penalty is unfortunately blurred, and the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."); *SEC v. Quan*, No. 11-cv-723 (ADM/JSM), 2014 WL 4670923, at \*12 (D. Minn. Sep. 19, 2014) ("The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation; any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." (citation modified)), *aff'd*, 817 F.3d 583 (8th Cir. 2016); *SEC v. Lawton*, No. 09-cv-368 (ADM/AJB), 2011 WL 494888, at \*3 (D. Minn. Feb. 7, 2011) ("[D]isgorgement need not be exact; courts need only find that the disgorged amount is a reasonable approximation of the gains received as a result of the securities law violation.").   Joint and several disgorgement may be appropriate for parties "engaged in concerted wrongdoing," *Liu v. SEC*, 591 U.S. 71, 90–91 (2020) (discussing disgorgement under 15 U.S.C. § 78u(d)(5)), and "when the entity is jointly owned and controlled by a single individual," *Markusen*, 143 F. Supp. 3d at 894 (citing *Cap. Sols.*, 28 F. Supp. 3d at 899).

Disgorgement should "not exceed a wrongdoer's net profits," so courts must "deduct legitimate expenses before ordering disgorgement." *Liu*, 591 U.S. at 75, 91–92. The burden rests with defendants to establish the legitimacy of any business expenses to deduct from the disgorgement amount. *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021); *CFTC v. Tayeh*, 848 F. App'x 827, 829–30 (11th Cir. 2021).   Defendants may not deduct expenses incurred while furthering a fraudulent scheme or "inequitable deductions" like "personal services." *Liu*, 591 U.S. at 92 (quoting *Root v. Lake Share & M.S. Ry.*, 105 U.S. 189, 203 (1881)).   "A defendant's inability to repay is not a consideration in determining

the amount to be disgorged." *Quan*, 2014 WL 4670923, at \*12 (citing *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008)).

The Commission seeks joint and several disgorgement of $3,026,504, and it has met its burden of establishing that figure "reasonably approximates the amount of unjust enrichment." *Markusen*, 143 F. Supp. 3d at 893 (citation modified). That amount is the difference between what promissory note investors gave to Phoenix and what Phoenix returned to them, as determined by Nicholas Magena, a Commission Staff Accountant. ECF No. 50 ¶ 4; *see* ECF No. 23-52 ¶ 9 ("In total, from March 2018 to November 2020, Phoenix issued at least 45 promissory notes, to 34 investors, in exchange for $4,489,376.32."); ECF No. 50-1 (showing $1,462,872.18 returned to investors). Courts routinely calculate disgorgement this way. *See, e.g.*, *SEC v. Cook*, Nos. 09-cv-3333 (MJD/FLN), 11-cv-574 (MJD/FLN), 2016 WL 128132, at \*4 (D. Minn. Jan. 12, 2016); *Lawton*, 2011 WL 494888, at \*4; *Cap. Sols.*, 28 F. Supp. 3d at 897.

Defendants challenge this calculation, but their arguments are not convincing. First, as they see it, the investor contribution was less than $4,489,376.32. Ms. Bowman testified that "investors provid[ed] $4,295,184.00" toward purchasing debt portfolios. ECF No. 56 ¶ 4. Unlike Mr. Magena, she does not describe how she arrived at her figure. *Contrast* ECF No. 23-52 ¶¶ 5–9 (explaining extensive record review), *with* ECF No. 56 ¶ 4 (lacking explanation). Ms. Bowman also appears to contradict herself in the same declaration. She testified that Exhibit J showed "wire transfers of investors' funds from Defendant Phoenix's account that were used to purchase debt portfolios," ECF No. 56 ¶ 37, and Exhibit J displays wire transfers totaling $5,647,346.92, ECF No. 56-10. Whether those

transfers were entirely investor funds, *see* ECF No. 56 ¶ 37, or whether investors provided only $4,295,184.00, *see id.* ¶ 4, cannot be determined from Exhibit J, *see* ECF No. 56-10. That document does not distinguish investor dollars and other sources—a tall task, given Phoenix's extensive commingling of business and personal funds. *See* ECF No. 56-10; Compl. ¶ 42. So I reject Defendants' figure and accept the Commission's amount of investor funds provided to Phoenix.

Second, Defendants argue only "ill-gotten *profits*" should be disgorged, ECF No. 55 at 7 (quoting *Cap. Sols.*, 28 F. Supp. 3d at 897), and Defendants did not profit by their securities fraud because they "did not defraud investors to personally pocket the money," *id.* at 8. In other words, Defendants see the unreturned funds as genuine business losses, not net profits, so they are not subject to disgorgement. *Id.* at 8–9; *see SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *19 (10th Cir. Dec. 16, 2021) (declining to disgorge investments that resulted in defendant's monetary loss). But their explanations for their inability to repay—that COVID-era restrictions prevented debt collections, and one debt collector defrauded Phoenix, ECF No. 55 at 8—cannot be accepted here because they are inconsistent with the Complaint, *see* Compl. ¶¶ 58–60, 62;[3] ECF No. 44 at 4–5 (requiring

---

[3]   As to Defendants' claim that one collection agency embezzled from Phoenix, the matter is slightly more complicated. The Complaint alleges:

> In November 2020, Bowman emailed the Note investors and attempted to blame the stopped interest payments on alleged embezzlement by Collection Agency A. Bowman's email claimed that Phoenix had been unable to catch the alleged embezzlement, even though Phoenix had been monitoring phone calls and auditing Collection Agency A's accounts. This

the Complaint's allegations to be accepted as true for the purposes of the instant motion). So I find that calculating disgorgement as the Note payments minus the repaid funds is appropriate. *See Cook*, 2016 WL 128132, at *4; *Lawton*, 2011 WL 494888, at *4; *Cap. Sols.*, 28 F. Supp. 3d at 897.

Joint and several liability is appropriate for the disgorged funds. Ms. Bowman was Phoenix's sole owner. ECF No. 56 ¶ 2; *see Markusen*, 143 F. Supp. 3d at 894 ("The Court may award disgorgement on a joint and several basis when the entity is jointly owned and controlled by a single individual."). She commingled her personal and business funds in Phoenix's account. Compl. ¶¶ 5, 42; *see SEC v. Smith*, No. CV 20-1056 PA (SHKx), 2020 WL 6712257, at *3 (C.D. Cal. Oct. 19, 2020) (finding joint and several liability warranted where individual commingled funds). Defendants do not contest joint and several liability.

Defendants argue that a substantial portion of the $3,026,504 should be deducted as legitimate business expenses. ECF No. 55 at 9–10. These expenses will be treated one at a time, but the short answer is that no deductions will be made.

*Additional $500,497 repaid to investors.* Mr. Magena testified that Defendants repaid approximately $1,462,872 to investors between May 2018 and May 2022. ECF No.

---

claim was also false and misleading since Phoenix had not performed any financial audits of Collection Agency A.

Compl. ¶ 62. So, strictly speaking, the Complaint accepts the possibility that Collection Agency A was embezzling from or defrauding Phoenix. But the Complaint also alleges that Defendants represented to investors that its collection agencies were insured against fraud, that "Phoenix never confirmed that Collection Agency A had actually obtained insurance protecting the Note investors' portfolios," and that the agency was in fact not insured. *Id.* ¶¶ 47–49.

11

50 ¶¶ 1, 4. Ms. Bowman testified that they repaid "a total of $1,963,369.65 on the loans," including "payments after May of 2022" to four investors. ECF No. 56 ¶ 36. This testimony is not credible. Defendants did not provide independent verification of this claim. Under the consent judgment, this assertion does not have to be credited. *See* ECF No. 44 at 5 ("[T]he Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure"). Throughout this litigation, Ms. Bowman has offered ample reason to disbelieve her statements.[4] Without independent evidence like repayment receipts or declarations from the investors, I do not accept that she repaid an extra half million dollars. This amount will not be deducted.

*$98,000 payments to Jean Brennan.* The Commission calculates Defendants paid approximately $98,000 to Brennan, Ms. Bowman's mother. ECF No. 50 ¶ 9. Ms. Bowman testified that her mother provided Ms. Bowman a $60,000 loan in October 2016, of which Ms. Bowman repaid $55,000. ECF No. 56 ¶ 14; ECF No. 23-16 at 14:25–15:25 (Ms. Brennan's deposition testimony that Ms. Bowman repaid the loan). This represents a separate financial stream not at issue in disgorgement. In other words, the repaid $55,000

---

[4]   Ms. Bowman has admitted to making materially false statements for the purposes of determining financial penalties. ECF No. 44 at 4–5 (admitting Complaint's allegations); Compl. ¶ 41 ("Bowman's and Phoenix's statements were false, misleading, and omitted key information."). As explained in this Order, Ms. Bowman's deposition testimony is sometimes at odds with her legal positions.

12

is not a legitimate business expense made with investor funds, so it is not eligible for deduction.

*$48,099.14 in rent to Ms. Brennan.*  Ms. Bowman testified that she paid $48,099.14 in rent and utilities to her mother.  ECF No. 56 ¶ 19; ECF No. 56-5 at 2.  Defendants argue she deducted these payments from her salary, so they count as business expenses.  ECF No. 55 at 11.  Previously, Ms. Bowman testified that the Phoenix offices were in her own house between 2018 and 2019, ECF No. 23-2 at 22:21–23:6, but the rent payments go from March 2018 to July 2020, ECF No. 56-5 at 2.  Without more specific information explaining the inconsistency between testimony that the Phoenix offices were in Ms. Bowman's home during a period she paid her mother rent or addressing the post-2019 period particularly, Defendants have not met their burden to show that these payments were legitimate business expenses.

*$32,500 in wages to Alex Bowman, Zach Bowman, and Emily Pollock.*[5]  Ms. Bowman testified that she paid her son Alex $18,300, her son Zach $11,200, and Alex's girlfriend Emily $3,000, all to perform data entry and clerical work for Phoenix during the span of March 2018 to March 2020.  ECF No. 56 ¶¶ 20–22; *see* ECF No. 23-27 (summary of payments to Alex); ECF No. 23-26 (summary of payments to Zach).  Ms. Bowman's

---

[5]     Defendants seek to deduct $60,000 for Alex, Zach, and Emily.  ECF No. 55 at 11–12.  The Commission determined that Defendants made "[a]pproximately $60,000 for payments towards education expenses for Bowman's sons."  ECF No. 50 ¶ 9.  Defendants do not know how the Commission calculated this number.  ECF No. 55 at 11 n.4.  It is Defendants' burden to show that business expenses were legitimate, and in this category they have claimed only $32,500 in wages paid to Alex, Zach, and Emily.  So I use $32,500, not $60,000.

13

deposition testimony undercuts this account. *See* ECF No. 23-1 at 269:10–12 ("[Y]es, my kids worked for me, but it didn't total like $36,000. I have millennials. They don't work. I had to beg them to work."); ECF No. 23-3 at 255:2–16 (testifying that Emily never worked for Phoenix). Documentary evidence undercuts this account, too. Some of the checks to Alex and Zach have "Merry Christmas" or "Happy Birthday!" written in the memo line, suggesting that the money was a gift, not a wage. ECF No. 23-27 at 15; ECF No. 23-26 at 4, 7. Defendants have not provided employee-employer tax forms, like W-2 or 1099 forms. Defendants have not met their burden to show that these were legitimate business expenses. *See Tayeh*, 848 F. App'x at 829–30. This amount will not be deducted.

$236,831.75 in wages to Kelly Wilson.* Defendants argue that Kelly Wilson's wages should be deducted. ECF No. 55 at 12–13; ECF No. 56-6 at 2–5 (showing $236,831.75 in payments to Ms. Wilson, most of which are marked "1099," "Commission," "Loan," or "Remit"). Ms. Wilson is Ms. Bowman's sister, and Phoenix employed her as a bookkeeper. ECF No. 23-2 at 10:9–10, 26:22–27:12. Ms. Bowman testified in two depositions that Ms. Wilson earned $36,000 per year in this role, and that she received health insurance but no other compensation. *Id.* at 214:10–12, 215:23–216:9; ECF No. 23-1 at 38:1–16, 40:2–7. As with Ms. Bowman's children, Ms. Wilson has no tax forms or other documentation confirming she received wages. Defendants have not established that these payments were legitimate business expenses, so this amount will not be deducted.

*$210,562.73 in Kelly Wilson's alleged embezzlement.* Defendants argue that Ms. Wilson's alleged embezzlement should be removed from the disgorgement calculation. ECF No. 55 at 13; ECF No. 56–7 at 2–11 (showing $210,562.73 in "unauthorized

14

payments" to Ms. Wilson).   Defendants contend that embezzled money "cannot be considered profits to Bowman or Phoenix," ECF No. 55 at 13, but neither can embezzled funds be considered legitimate business expenses.

*$206,069 for an Arizona condo.*   Defendants seek to exclude Ms. Bowman's purchase of an Arizona condo because, they argue, it was purchased with personal funds and not business expenses.  ECF No. 55 at 13–14; ECF No. 56 ¶¶ 27–28.  Ms. Bowman points to Exhibit H of her Declaration as evidence there were "wire transfers from the proceeds of [her] personal portfolios which totaled $206,069.00 . . . that was used for the purchase of the Arizona home."  ECF No. 56 ¶ 28; *see* ECF No. 56-8 (Exhibit H).  That document includes ten pages of expenses, and it is not readily apparent which wire transfers paid for the condo, or which payments came from a personal portfolio.  *See* ECF No. 56-8. Ultimately, it does not matter for at least two reasons.  First, if the Arizona condo was not a business expense, as Defendants argue, then it cannot be deducted from the disgorgement calculation.  Second, there is no "tracing" requirement for disgorgement when a defendant commingled business and personal funds.  *See SEC v. Rosenthal*, 426 F. App'x 1, 3 (2d Cir. 2011) (unpublished summary order) ("Imposing such a tracing requirement would allow an insider trading defendant to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits."); *SEC v. Perkins*, No. 5:19-CV-243-FL, 2023 WL 5418712, at *5 (E.D.N.C. Aug. 22, 2023) ("[The defendant] may not now avoid disgorgement by claiming that other untainted funds were commingled with investor funds.").

15

*$271,246.84 in Capital One charges.*  Defendants seek to deduct charges made on a Capital One credit card.  ECF No. 55 at 14; *see* ECF No. 50-4 (identifying $271,246.84 in "Capital One credit card charges for non-business expenses or for the benefit of family members" from March 2018 to November 2020).  These payments went to restaurants, grocery stores, gas stations, retail stores, and Vikings tickets, among others.  *See, e.g.*, ECF No. 50-4 at 4.  Defendants do not identify any line item as a business expense.  Instead, Defendants argue that $99,430.73 were "charges . . . for Phoenix's business expenses." ECF No. 55 at 14; *see* ECF No. 56 ¶ 30; ECF No. 56-9 at 2–9 (showing payments marked as Phoenix business expenses charged to the Capital One card in that amount).  These are two different lists of expenses, so there is no reason to deduct the $271,246.84 in non-business expenses.  *Contrast* ECF No. 50-4, *with* ECF No. 56-9.  Nor will the $99,430.73 be deducted.  The documentation supporting that request is bereft of detail: Each payment is marked simply as "Business Expenses for office," with no identifying information.  *See* ECF No. 56-9 at 2–9.  Ms. Bowman testified that the Capital One card was "both" a "personal credit card" and a "Phoenix credit card."  ECF No. 23-2 at 42:16–20.  In light of the commingled funds, Defendants have not met their burden to show that the $99,430.73 or $271,246.84 were legitimate business expenses.

*$117,000 in business ventures.*  Defendants seek to deduct Ms. Bowman's investments in JudgeMyFoto, a furniture company, and a collection agency.  ECF No. 55 at 14–15.  Ms. Bowman attested that Phoenix funds were not used in those investments. ECF No. 56 ¶ 31.  Therefore, these are not legitimate business expenses and will not be deducted.

16

*$267,368.79 in executive compensation.* Defendants seek to deduct this amount as Ms. Bowman's compensation for owning and managing Phoenix. ECF No. 55 at 15–16; *see* ECF No. 56 ¶ 32. They arrive at this amount by subtracting most of the dollar amounts discussed above (a total of $1,243,809.57) from the Commission's total claimed non-business expenses ($1,511,178.36). ECF No. 55 at 15 nn.5–6; ECF No. 50-3; ECF No. 50-4. Defendants do not produce contemporaneous documentation showing that Ms. Bowman's executive compensation was $267,368.79; instead, they argue that none of the $1,511,178.36 identified by the Commission was a non-business expense, and all otherwise unaccounted-for expenses went to paying Ms. Bowman's salary. ECF No. 55 at 15–16. Ms. Bowman's declaration that she received $267,368.79 executive compensation, and that those funds were not used on "meals, healthcare expenses, football tickets, and spas," is not credible. ECF No. 56 ¶ 32. The Commission has demonstrated that Defendants spent money on restaurants, Viking tickets, nail spas, and other non-business expenses. *See* ECF No. 50-4. Not a single line item among the $1,511,178.36 is marked as "salary" or something that can be reasonably construed as executive compensation. *Id.* Further, this argument contradicts Ms. Bowman's prior testimony that her base salary as Phoenix's executive was $5,000 per month, and that she received 20 percent on commissions and health insurance, but no additional profits. ECF No. 23-1 at 41:7–42:11. At that salary, Ms. Bowman would have earned $165,000 over the thirty-three months from March 2018 to November 2020. *See* ECF No. 50 ¶ 3 (setting time frame). Defendants do not point to record evidence showing how much Ms. Bowman earned in commissions, and without

17

that, it is not credible that she was paid $267,368.79 in executive compensation in under three years.

To summarize, the Commission has met its burden of persuasion to show that Defendants are jointly and severally liable, and that disgorgement of $3,026,504 reasonably approximates the amount of unjust enrichment. The burden shifts to Defendants, who have not shown any legitimate business expenses, so no deductions will be granted.[6]

### III

In the Consent Judgment, Defendants agreed to pay prejudgment interest on the disgorgement of ill-gotten gains. ECF No. 44 at 4. "Prejudgment interest shall be calculated from March 1, 2020, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." *Id.*; *see Quan*, 2014 WL 4670923, at *14 ("The rate of interest commonly used by courts when ordering prejudgment interest in connection with disgorgement is the rate applied by the Internal Revenue Service ('IRS') for the underpayment of federal income tax.").

---

[6]    It is conceivable that Ms. Bowman's $60,000 salary was a legitimate business expense. ECF No. 23-1 at 41:7–42:11; *see* ECF No. 58 at 11 n.3. As Defendants pointed out during oral argument, that figure is not unreasonable for the president of an investment company. But the better course is not to make that deduction. It is Defendants' burden to establish legitimate business expenses. *See Markusen*, 143 F. Supp. 3d at 893. They bear the risk of uncertainty in assessing disgorgement. *Cap. Sols.*, 28 F. Supp. 3d at 897. The evidence that Ms. Bowman earned $60,000 annually is her deposition testimony, and there are no tax forms or business records showing her earnings. And as explained above, Ms. Bowman is not credible on these issues. Lastly, Defendants do not argue (even in the alternative) that the annual $60,000 should be deducted. For all these reasons, Ms. Bowman's self-described $60,000 yearly salary will not be deducted.

Defendants will be ordered to pay, jointly and severally, $916,072 in prejudgment interest.  Mr. Magena calculated the interest from March 1, 2020, to March 4, 2025 (the date the Defendants signed the Consent Judgment), according to the rate in 26 U.S.C. § 6621(a)(2).  ECF No. 50 ¶ 7.  Defendants do not contest the method or result, but challenge only the underlying amount of disgorgement.  *See* ECF No. 55 at 16.  Since I agree with the Commission's disgorgement amount, I will order Defendants to pay $916,072 in prejudgment interest.

IV

Defendants agreed to "a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  ECF No. 44 at 4.  These provisions are "intended both to punish the individual violator and to deter future violations of the securities laws."  *SEC v. Brown*, 643 F. Supp. 2d 1088, 1090 (D. Minn. 2009) (quoting *SEC v. Marker*, 427 F. Supp. 2d 583, 592 (M.D.N.C. 2006)), *aff'd*, 658 F.3d 858 (8th Cir. 2011) (per curiam).

Both statutes set up three civil-penalty tiers.  *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B); *SEC v. Jarkesy*, 603 U.S. 109, 124 (2024).  The third and highest tier applies where the securities violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  The third-tier penalty's maximum is either "$100,000 for a natural person or $500,000 for any other person" or "the gross amount of pecuniary gain to such defendant as a result of the violation."  *See* 15 U.S.C.

§§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  The former value is annually adjusted for inflation, *see* 17 C.F.R. § 201.1001(b), and the current third-tier maximum is $236,451 for a natural person and $1,182,251 for any other person, *Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2025)*, U.S. Sec. & Exch. Comm'n, https://www.sec.gov/enforce/civil-penalties-inflation-adjustments (last visited May 4, 2026).  "[C]ourts may assess a penalty equal to the gross pecuniary gain of the defendant irrespective of whether that amount exceeds the maximums listed above."  *Brown*, 643 F. Supp. 2d at 1090.

"The amount of a civil penalty should be determined in light of the facts and circumstances of the particular case."  *Cap. Sols.*, 28 F. Supp. 3d at 901 (citation modified).  Courts consider the following factors:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Id.* (quoting *Brown*, 643 F. Supp. 2d at 1090); *accord Quan*, 2014 WL 4670923, at *15.

Here, the statutory requirements for the third tier are met.  Defendants' conduct was fraudulent and directly resulted in substantial losses to other persons.  Defendants made numerous material misrepresentations in advertising the promissory notes, including that the investment funds would be used only for business purposes, that Phoenix investments were safe because of the organization's due diligence, that the debt collection agencies were insured, that Phoenix had never been a named defendant in a lawsuit, and that

investors' accounts would be audited every six months. Compl. ¶¶ 41–55. Bowman and Phoenix made these misrepresentations knowingly or recklessly. *Id.* ¶ 56. The misrepresentations violated federal securities law. *Id.* ¶¶ 66–74. They caused substantial losses to investors, who provided almost $4.5 million and received only $1.5 million in return. ECF No. 23-52 ¶ 9; ECF No. 50-1. Defendants argue their statements did not cause substantial losses, because their inability to repay investors was caused by COVID-19 and a collecting agency withholding funds. ECF No. 55 at 17. As the Commission notes, this argument contradicts the Complaint's allegations, which must be accepted in this posture. ECF No. 58 at 21–22. The PowerPoints misrepresented that all debt-collection agencies were insured for fraud; investors would have been protected had Defendants' representations been true. *See* Compl. ¶¶ 37, 48–50. And the Complaint alleges it was "false and misleading" to blame the pandemic for debt collection restrictions. *Id.* ¶¶ 58–60.

The first four case-law factors indicate that penalties at the high end are appropriate. (1) Defendants' conduct was egregious. Promissory note funds were not used for business purposes only; Ms. Bowman and Phoenix shared a bank account. Compl. ¶¶ 43–45; ECF No. 56 ¶ 9. Defendants were sued at least twice for violating a consumer protection statute, despite assuring investors that had never happened. Compl. ¶¶ 39, 54. Defendants argue their actions were not egregious because they "did not pocket millions of dollars at the expense of defrauded parties." ECF No. 55 at 19. The record shows Ms. Bowman made substantial personal expenditures with Phoenix's funds, so this is not convincing. (2) Defendants acted with scienter. They violated Section 10(b) of the Exchange Act and

21

Rule 10b-5, which requires a showing of that mental state. *See SEC v. Shanahan*, 646 F.3d 536, 541 (8th Cir. 2011).   (3) Defendants' securities fraud caused investors to incur substantial losses, as explained above.   (4) Defendants' conduct was not isolated but recurrent, defrauding thirty-four investors from March 2018 to November 2020.   ECF No. 50 ¶ 3.   That is about a year longer than the time frame in *Brown*, where this factor was met. *See Brown*, 643 F. Supp. 2d at 1090–91; *SEC v. Brown*, 579 F. Supp. 2d 1228, 1231 (D. Minn. 2008) (providing factual background in a report and recommendation). Some schemes have lasted longer, *see Markusen*, 143 F. Supp. 3d at 889 (five years); *Quan*, 2014 WL 4670923, at *2 (ten years), but this factor nevertheless supports a high civil penalty.

The fifth and final factor—the defendant's current or future financial condition— supports a modestly reduced penalty.   Ms. Bowman has been unemployed since March 2024.   ECF No. 56 ¶¶ 34–35.   She is permanently enjoined from "participating in the issuance, purchase, offer, or sale of any security," so that line of work is closed to her.   ECF No. 44 at 3.   Ms. Bowman owns no real estate or debt portfolios, and Phoenix is currently "defunct and brings in no revenue." ECF No. 56 ¶¶ 33, 35.   On the other hand, it is possible Ms. Bowman will recoup money from her pending litigation.   *See* ECF No. 50-5 at 5 (amended complaint in *Phoenix Asset Group, LLC v. Baughman* in New York state court, filed December 27, 2023, seeking $368,118.00 plus interest); ECF No. 29-1 at 2–20 (second amended complaint in *Phoenix Asset Group, LLC v. URS Solutions LLC* in the United States District Court for the Western District of New York, filed July 5, 2022, seeking over $33 million against five defendants).   The parties agree that these suits

22

represent a real chance of recovery for Ms. Bowman and Phoenix, though Defendants believe any proceeds from those lawsuits "would go towards paying the disgorgement judgment and on the outstanding debts of Phoenix."  ECF No. 55 at 22; *see* ECF No. 49 at 22 ("Recovery in any of these lawsuits would mean more money for Defendants, which in turn could help satisfy the [Commission's] penalty demands.").  In any case, the suits' likelihood of success is uncertain.

In light of these considerations, a significant though not maximum third-tier penalty is appropriate.  The statutory maximum is the Defendants' "gross pecuniary gain," and though no party calculates that number, it is presumably equal or close to the disgorgement amount.  *See SEC v. Yang*, 670 F. Supp. 3d 695, 719 (E.D. Wis. 2023) (ordering disgorgement of net pecuniary gain, which was less than gross pecuniary gain). Defendants' diminished financial capacity counsels against applying the statutory maximum.  *See Cap. Sols.*, 28 F. Supp. 3d at 900–02 (reducing individual penalty from $150,000 to $50,000 and business penalty from $725,000 to $15,000); *see SEC v. Orr*, No. 11-2251-SAC, 2012 WL 1327786, at *12 (D. Kan. Apr. 17, 2012) ("[T]he court has given significant weight to the defendants' distressed financial conditions and concludes that second-tier penalties are appropriate as to each of them.").  I will impose a civil penalty of $200,000 on Ms. Bowman and $1,000,000 on Phoenix.  This penalty is well below the gross pecuniary gain and slightly below what would otherwise be the maximum penalty: $236,451 for a natural person and $1,182,251 for any other person.  This amount is sufficient to punish the wrongdoers and deter future violations.

23

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Plaintiff United States Securities and Exchange Commission's Motion for Financial Remedies [ECF No. 46] is **GRANTED** as follows:

1.     Defendants Phoenix Asset Group, LLC, and Robyn A. Bowman are liable, jointly and severally, for disgorgement of $3,026,504 and prejudgment interest in the amount of $916,072.

2.     Defendant Phoenix Asset Group, LLC, shall pay a civil penalty in the amount of $1,000,000.

3.     Defendant Robyn A. Bowman shall pay a civil penalty in the amount of $200,000.

4.     Defendants shall satisfy these obligations by paying the above-ordered amounts to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

5.     Defendants may transmit payment electronically to the Securities and Exchange Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the Securities and Exchange Commission's website at http://www.sec.gov/about/offices/ ofm.htm. Defendants may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to:

24

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Phoenix Asset Group, LLC, and Robyn A. Bowman as the defendants in this action; and specifying that payment is made pursuant to this Final Judgment.

6.     Defendants shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Securities and Exchange Commission's counsel in this action.  By making this payment, Defendants relinquish all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendants.

7.     The Securities and Exchange Commission may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment.

8.     The Securities and Exchange Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.*, and moving for civil contempt for the violation of any Court orders issued in this action.  Defendants shall pay post-judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. § 1961.  The Securities and Exchange Commission shall hold the

25

funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

9.      The Securities and Exchange Commission may propose a plan to distribute the Fund subject to the Court's approval.  Such a plan may provide the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain jurisdiction over the administration of any distribution of the Fund, and the Fund may only be disbursed pursuant to an Order of the Court.

10.      Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Final Judgment shall be treated as penalties paid to the government for all purposes, including tax purposes.  To preserve the deterrent effect of the civil penalty, Defendants shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendants' payment of disgorgement in this action, argue they are entitled to, nor shall they further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendants' payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendants shall, within 30 days after entry of a final order granting the Penalty Offset, notify Securities and Exchange Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Securities and Exchange Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Final Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against

26

Defendants by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

11.    This Court shall retain jurisdiction of the matter for the purposes of enforcing the terms of the Final Judgment.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  May 4, 2026                                    s/ Eric C. Tostrud
                                                               Eric C. Tostrud
                                                               United States District Court

27